**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 19-10459-RWZ** |
| | ) | |
| **21. ANGEL RODRIGUEZ** | ) | |
| **A/K/A "King Ace,"** | ) | |
| **Defendant.** | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION FOR RELEASE FROM CUSTODY

The United States of America, by Andrew E. Lelling, United States Attorney, and Rachel Goldstein and Mark Grady, Assistant United States Attorneys, hereby respectfully oppose Defendant Angel Rodriguez's ("Rodriguez" or "the Defendant") Motion For Release From Custody (the "Motion"). [D. 714].[1]  Rodriguez seeks release to home confinement because he claims that he has a medical history—including asthma and a history involving both a collapsed lung and MRSA staph infection—that makes him more susceptible to severe illness if he were to contract the COVID-19 virus while incarcerated.

The Government appreciates the gravity of the COVID-19 pandemic and acknowledges that it presents a serious national and state public health emergency.  However, even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate.  In this case, the Section 3142(g) factors weigh heavily in favor of Rodriguez's detention, and the Government can readily carry its burdens of showing that, if released, Rodriguez would be a danger to the community and a flight

---

[1] Docket Entries are identified by docket and page numbers.

risk.  Indeed, given the serious nature of the charged conduct, the weight of evidence against Rodriguez, his voluminous criminal history including violence and witness intimidation, his repeated pattern of violating conditions of release, and his evasion of arrest on the instant charges, it is clear that no set of conditions will ensure his appearance or the safety of the community.

Nor does Rodriguez's claimed asthma or other conditions shift the detention calculus in his favor.  He provides no credible documentation for his conditions and neglects to show that— even if he does suffer from them—they are sufficiently acute to make him more susceptible to COVID-19 than the average detainee.   He also alleges only a speculative prospect of a COVID-19 outbreak at the Plymouth County House of Corrections ("Plymouth") where he is housed, and fails to show the inadequacy of the measures taken by Plymouth to prevent the spread of the virus. Nor does Rodriguez show how—in light of his criminal record and probation violations—his proposed plan for release to his girlfriend's home would ensure his appearance or the safety of the community.  Since the risk of COVID-19 does not negate the factors favoring detention, and no conditions could ensure the safety of the community or his appearance if he were to be released, Rodriguez's Motion should be denied and he should be detained.

## I.      Procedural Background

On December 4, 2019, a Grand Jury sitting in the District of Massachusetts indicted Rodriguez, along with dozens of others, for conspiracy to conduct enterprise affairs through a pattern of racketeering activity ("RICO conspiracy"), in violation of 18 U.S.C. §1962(d).  [D. 1]. Although a warrant for his arrest was issued on December 4, 2019, Rodriguez evaded arrest for nearly three months, until February 28, 2020.  [D. 567].  Rodriguez made his initial appearance before this Court on March 5, 2020, when the Government moved for his detention and he pleaded not guilty and agreed to voluntary detention.  [D. 575].  On April 14, 2020, Rodriguez filed the

instant Motion, [D. 714] and supporting Memorandum, seeking release based on the COVID-19 pandemic and requesting a detention hearing, [D. 715].

In response to the COVID-19 pandemic, Plymouth has followed Massachusetts' Department of Public Health guidance to minimize the risk of introduction and transmission of the virus, and it has instituted a "vigorous process of screening and cleaning continuously around the clock."[2]  On March 23rd, Plymouth announced that one of the Sheriff's Department's employees had tested positive for COVID-19.  The employee was quarantined, and Plymouth took steps to minimize the risk of transmission: all areas in the facility where the staff member had been were disinfected, and staff who had had exposure within 6 feet of the staff member for more than 15 minutes were directed to self-quarantine and not allowed to return to work for 14 days or until they tested negative.  Further, Plymouth conducted an assessment of who had been in proximity to the infected staff member and determined that no federal detainees had been in contact with him/her. There have been no additional reported cases of COVID-19 among Plymouth staff or detainees.

## LEGAL STANDARD

A defendant must be detained pending trial if, after a hearing, the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence or that the defendant poses a flight risk by a preponderance of the evidence.  18 U.S.C. § 3142(f).

In determining whether any conditions of release will reasonably assure the defendant's appearance and the safety of any other person and the community, the Court must consider the

---

[2] These announcements have been posted to the Plymouth County Sheriff's Department website, available at: https://www.pcsdma.org/covid.html.

factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.

## <u>ARGUMENT</u>

Rodriguez's Motion entirely ignores the Section 3142(g) factors that guide this Court in determining whether he should be detained, and argues for release solely on the basis that his claimed medical conditions make him susceptible to severe illness if he were to contract COVID-19.  [D. 715 at 1].  Yet, the COVID-19 pandemic—while undoubtedly serious and necessitating strong precautionary steps, particularly in facilities like Plymouth—does not alter the facts and circumstances particular to Rodriguez that demonstrate the particular danger to the community, flight risk, and obstruction risk he poses.  Accordingly, his release is not warranted.

**I.      Rodriguez Is a Danger to the Community, A Flight Risk, and an Obstruction Risk and the 18 U.S.C. § 3142(g) Factors Strongly Support Detention**

The Government moves for Rodriguez's detention on the grounds that he is: (1) a danger to the community, under 18 U.S.C. § 3142(f)(1)(E), because the charged offense is a felony involving the possession or use of a firearm; (b) a flight risk, under 18 U.S.C. § 3142(f)(2)(A); and (c) a risk of obstruction of justice, under 18 U.S.C. § 3142(f)(2)(B).  In this case, the Section 3142(g) factors strongly support Rodriguez's detention.

### *A. The Nature and Circumstances of the Charged Offense and Weight of the Evidence Against Rodriguez Support His Detention*

When considering detention, the court considers the nature and circumstances of the offense charged as well as the weight of the evidence against the defendant.  18 U.S.C. § 3142(g)(1)-(2).  Here, both the serious nature of the racketeering conspiracy and the strength of the Government's case against Rodriguez weigh heavily in favor of detention.

Rodriguez is charged with conspiracy to conduct an enterprise—namely, the Almighty Latin King and Queen Nation (the "Latin Kings") gang in Massachusetts—through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and (d).  [D.1 ¶ 7].  Rodriguez and other gang members are charged with conducting the gang's activities through a pattern of racketeering activity that includes acts and threats involving murder and attempted murder of rival gang members and Latin King members who violated gang rules; robbery; witness tampering and witness intimidation; money laundering; and narcotics distribution.  [D. 1 ¶ 8].

There is ample evidence of Rodriguez's participation in this activity.  Exhibit 1 is an affidavit by FBI Special Agent Dominic Coppo, which describes the findings of the multi-year investigation that led to the charge against Rodriguez.  Exhibit 1 details evidence that Rodriguez was a member of the Devon Street Kings ("D5K") chapter of the gang, and that he served in a leadership role, as Crown Council Chairman of the Boston Crown Council.  *See* Exhibit 1 ¶ 70. The "Crown Council" is responsible for resolving internal gang issues that cannot be resolved by the state leadership.  *Id.* ¶ 20.   The Government has compiled considerable evidence of Rodriguez's participation in the Latin Kings' racketeering conspiracy, including:

- An undercover recording on October 9, 2019 captures Rodriguez packaging cocaine base for distribution at one of the Latin Kings' stash houses in New Bedford, Massachusetts.  During the recording, another Latin King member refers to Rodriguez packaging 62 grams of crack cocaine and says that Rodriguez can make $4,000 by dividing the crack cocaine into smaller quantities for street-level distribution.  *Id.* ¶ 76.

- Undercover recordings of telephone calls in December 2018, when Rodriguez was in state prison, reflecting that he participated in a conspiracy with other Latin Kings members to intimidate and murder Victim 5, who they suspected was a law enforcement informant:

  - In recorded calls discussing Victim 5 on December 18, 2018, Latin King members said Rodriguez was "running the jails right now," he "run[s] the DOC," they should talk to him about retaliating against

Victim 5 for being a snitch, and Rodriguez's sister should call him to "make sure [he] gets on that ASAP." *Id.* ¶¶ 195-96.

o In other recorded calls on December 18, 2018, Rodriguez and Latin King members describe Victim 5 as a rat and attempt to identify him by name and description, and one member states that he wants to see paperwork proving that Victim 5 is a snitch before Rodriguez "makes something up there." *Id.* ¶¶ 197, 199.

o In recorded calls on December 20, 2018, Rodriguez and another Latin King member discuss records of grand jury testimony naming Victim 5 as a law enforcement informant, and a plan to visit Rodriguez in jail later that week to further discuss the matter. *Id.* ¶ 202. Consistent with this discussion, Massachusetts Department of Corrections records reflect that the same Latin King member visited Rodriguez in jail on December 23, 2018. *Id.* at 65, n.11.

• Massachusetts Department of Correction call records reflect that on March 23, 2018, Rodriguez, who was incarcerated at the time, called into a recorded Latin Kings meeting where Latin Kings leaders discussed a "greenlight" order to murder Victim 19. *Id.* ¶ 252.

• Multiple YouTube rap videos that feature Rodriguez and other Latin Kings members holding money, flashing firearms and gang signs, and describing shooting members of rival gangs. *Id.* ¶ 72. This includes:

o A YouTube video posted in June 2019 where Rodriguez raps about shooting "enemy's" and "splattering brains" of "snitches." *Id.* ¶ 73.

o A YouTube video posted in September 2016 where Rodriguez flashes the gang's hand sign with another Latin Kings member and raps about being shot in the back and retaliating: "Ya'll thought I was finished . . . I'll be down to ride, I'm talking homicide, put like 30 in the clip and let them bullets fly." He also describes being a shooter: "I'll be banging D5K screaming fuck a DDP," referring to the Dominicans Don't Play rival street gang. *Id.* ¶ 75.

• An undercover recording captures Rodriguez's attendance at a meeting of the Latin Kings' Massachusetts leadership on August 31, 2019, where they discussed an order to kill another Latin King member. *Id.* ¶ 167.

There is thus considerable evidence that Rodriguez was a member of the Latin Kings and participated in a pattern of racketeering activity, including by conspiring to intimidate informants

and distribute narcotics.  The serious nature of the charged conspiracy, along with the strong evidence of Rodriguez's participation in it, weigh in favor of detention.

### B. *Rodriguez's History and Characteristics Strongly Support Detention*

Rodriguez's history and characteristics, including his past conduct, criminal history, record of appearances at court proceedings, and status on state parole at the time of the charged offense—all relevant factors under 18 U.S.C. § 3142(g)(3)—further evince the threat he poses to the community, his flight risk, and his serious obstruction and witness intimidation risk.  No conditions can be devised to address these risks, and this factor therefore clearly supports detention.

A "record of criminal convictions and [a] disregard for the judicial system through repeated violations of the terms of [] probation" can form the basis for an order of detention.  *United States v. Gray*, 529 F. Supp. 2d 177, 182 (D. Mass. 2007).  As discussed below, Rodriguez has a voluminous criminal record that includes: (1) a pattern of violence that shows total disregard for the safety of the community; (2) multiple witness intimidation charges that illustrate how his release would pose obstruction of justice risks; and (3) numerous instances where he committed new crimes while on probation, reflecting an inability to comply with conditions of release.

i. <u>Rodriguez's Criminal Record Shows That He Presents A Danger To The Community And A Risk Of Witness Intimidation If Released</u>

Rodriguez's criminal history reflects a pattern of violent assaults and witness intimidation charges and shows that he would present a threat to the safety of the community as well as a serious risk of obstruction of justice if he were released.  His criminal history includes, in fewer than five years: assault with a dangerous weapon and witness intimidation (January 2016); assault and battery on a public employee (April 2016); aggravated assault on a pregnant victim (June 2016); threatening to commit a crime involving assault (October 2016); assault and battery with a dangerous weapon and witness intimidation (June 2017); and possession with intent to distribute

7

crack cocaine (October 2019). Notably, in 2016 and 2017, Rodriguez was charged with four counts of witness intimidation. Both cases involved violent attacks on innocent victims, whom Rodriguez threatened to discourage them from talking to the police and testifying against him.

In January 2016, Rodriguez was arraigned in Suffolk Superior Court (Dkt. # 1584-CR-11273) on charges of armed robbery, assault with a deadly weapon, assault and battery with a dangerous weapon, and witness intimidation. *See* Exhibit 7 at 2. Rodriguez participated in an armed robbery with two other men in September 2015: the other two men robbed a victim at knifepoint, while Rodriguez served as lookout. *Id.* at 12. After the robbery, the victim approached a police cruiser to report the crime, and while he was awaiting assistance, Rodriguez stood across the street and "brandished a knife and proceeded to stare at the victim." *Id.* Rodriguez pleaded guilty to the witness intimidation charge and was sentenced to six months' incarceration. *Id.* at 2.

In June 2017, Rodriguez was arraigned in Middlesex Superior Court (Dkt. # 1781-CR-00203) on two counts of witness intimidation, one count of assault and battery with a dangerous weapon causing serious bodily injury, and one count of assault and battery on a family or household member. *See* Exhibit 4 at 6. The charges arose from an incident in March 2017 when he violently attacked his then-girlfriend, Tanisha Lozada, and threatened her not to talk to the police or testify against him. According to the Commonwealth's successful motion for pretrial detention, Rodriguez was at Lozada's apartment in Lowell, where she lived with her children, when they got in an argument that led Rodriguez to viciously attack her:

> The defendant punched the victim on the side of her neck with a closed fist causing the victim to fall to the floor. The victim got back up. The defendant then punched the victim several times in the head, face and eyes with significant force. The defendant then grabbed the victim by her hair and pulled her into the bedroom. The defendant threw the victim face first into the side rail of a metal bedframe. The victim's face made contact with the bedframe causing her to bleed profusely from her nose. When the victim got up, the defendant continued to strike the victim.

Exhibit 5 at 2.  Rodriguez then followed Lozada into the bathroom and, believing that the police were at the door, told her "to be quiet, not say anything and to tell the police they were just arguing on the phone. [He] told [her] that if she ever said anything, she would probably get hurt again." *Id.*  Rodriguez was arrested and charged with domestic abuse offenses.  While he was in custody awaiting a dangerousness hearing in the Lowell District Court, he placed multiple recorded calls to Lozada where he told her about his and other criminal cases where victims helped him and "other people" out by not showing up for court, asserting the Fifth Amendment privilege, or vouching for the defendant.  *Id.* at 3. Lozada interpreted these comments as instructions that she should not testify against him.  *Id.* at 3.  In November 2017, Rodriguez pleaded guilty to all four charges and was sentenced to 2.5 years' incarceration and probation of three years.

Rodriguez's history of domestic and other violence does not begin or end with these two serious cases.  He has also been charged with multiple other assaults that reflect his flagrant disregard for the safety of others and his complete inability to control his behavior to comport with the basic norms of civil society:

1. In April 2016, Rodriguez was arraigned in Boston Municipal Court (Dkt. # 1601-CR-00291) on charges of assault and battery, assault and battery on a public employee, and disrupting a court proceeding.  *See* Exhibit 6 at 13.  The charges arose from an incident where Rodriguez fought with another man in a Suffolk Superior Court room.  *Id.* at 20.  After the men "started punching each other multiple times," a court officer attempted to intervene, and Rodriguez "punched [the officer] in the back of the head."  *Id.*  In December 2016, Rodriguez pleaded guilty to one count of assault and battery and received a split sentence.  *Id.* at 22.  He was on probation for this offense when he assaulted Lozada in March 2017.  In May 2017 he was found in violation of his probation and sentenced to serve ten months.  *See id.* at 11, 25.

2. In June 2016, Rodriguez was arraigned in Boston Municipal Court (Dkt. # 1607-CR-002363) for aggravated assault and battery on a pregnant person. This charge arose from an incident where Rodriguez "struck his then girlfriend in the head and stomach and bit her wrist" at a time when she was four months pregnant.  *See* Exhibit 3 at 3; Exhibit 5 at 4. This charge was dismissed on March 1, 2017.  *See id.*

9

3. In October 2016, Rodriguez was arraigned in Boston Municipal Court (Dkt. # 1607-CR-003910) on a charge of threatening to commit a crime, arising from an incident where he allegedly harassed Lozada's ex-boyfriend and the father of her child via phone calls and in person threats to fight and hurt him. *See* Exhibit 3 at 3; Exhibit 5 at 4. This was dismissed in April 2017, though he was on pretrial release when he assaulted Lozada in March 2017. *See id.*

Thus, in a period of just ten months, Rodriguez was charged in four separate cases involving assaults, and he committed two of those while on probation or pretrial release for other crimes.

Rodriguez was arrested yet again in October 2019, this time with another Latin King member, for possession with intent to distribute crack cocaine following a traffic stop in New Bedford. *See* Exhibit 2 at 3. According to the Arrest Report, Rodriguez, who was driving, had a knife in his waistband and roughly 13 grams (including packaging) of crack cocaine, "packed in a manner consistent with the distribution of street level narcotics," concealed in his pants. *Id.* at 4.

Rodriguez's record of violent attacks on others—ranging from former girlfriends to court officers—along with his repeated efforts to silence the victims of his attacks show that he presents a serious risk of witness intimidation and a danger to the community. This is particularly so given his proposed plan for release: to live in a 24-hour-lockdown at the home of his girlfriend and her three children. [D. 715 at 6]. There is no reason to believe this is an appropriate and safe plan for release for a person like Rodriguez, who has a history of domestic violence against girlfriends, without regard to their children. Indeed, he was charged with assaulting two prior girlfriends, including striking the pregnant belly of one, and savagely beating another before throwing her face-first into a metal bedframe—all under the roof of her home where she lived with her children.

Notably, this Court would not be the first to find that Rodriguez is too dangerous to be released. In 2017, the Middlesex Superior Court granted the Commonwealth's motion to detain Rodriguez, finding that no conditions of release could assure the safety of the victim or community

if he were released.  *See* Exhibit 5 at 1. The motion emphasized the danger and flight risk he presented: (1) Lozada's medical records showed Rodriguez had been physically violent to her in the past; (2) he had two restraining orders against him by a prior domestic partner; (3) he was on pretrial release on three separate cases out of three different courts at the time of the offense; and (4) he "has violated probation in nearly every case where he has been placed on probation (totaling eight separate violations) resulting in multiple committed sentences" and he "frequently defaulted on his court dates or [has] been placed in warrant status both before and after disposition."  *Id.* at 6-7.  In granting the motion, the court noted that Rodriguez's "prior record of violence and his apparent attempt to interfere with the investigation here supports a finding that there are no conditions that can protect the victim or the community if he were released on bail." *Id.* at 1.

The compelling reasons that supported detention in that case are applicable here: Rodriguez has proven himself a repeat perpetrator of domestic violence and, as discussed below, he has proven himself unable to abide by conditions of release.  Given his record, his release on the proposed conditions would be a risk to the community, including his girlfriend and her children. Moreover, his pattern of witness intimidation raises concerns that, if released, he would engage in similar efforts to intimidate witnesses in this case.  This criminal history amply supports detention.

> ii.  <u>Rodriguez's History Of Violating Probation Shows That He Is A Flight Risk And Danger To The Community</u>

On top of his record of threatening witnesses and committing violent attacks (which alone present a compelling basis for detention), Rodriguez's history of violating court-ordered conditions of release, and resisting arrest in this case for nearly three months, shows that no conditions can reasonably assure his appearance.  Rodriguez violated the conditions of his release on numerous occasions between 2016 and his arrest on the instant charges in 2020:

1.  In August 2016, Rodriguez failed to appear in Suffolk County Court for a hearing on his robbery and witness intimidation charges, and the court issued a warrant for his arrest. *See* Exhibit 7 at 5-6.

2.  In October 2016, the Boston Municipal Court revoked Rodriguez's bail on the charges for assault and battery and disrupting a court proceeding, and committed him to jail after finding that he violated the court's bail conditions. *See* Exhibit 6 at 6-7.

3.  In March 2017, when Rodriguez committed the violent attack and witness intimidation that gave rise to the charges in the Middlesex Superior Court, he was on probation or pre-trial release in multiple cases:

    a.  He was on probation in Boston Municipal Court (Dkt. # 1601-CR-00291), which revoked his probation and sentenced him to ten months incarceration. S*ee* Exhibit 6 at 8, 11.

    b.  He was on pre-trial release in Boston Municipal Court (Dkt. # 1607-CR-003910) on charges of threatening to commit a crime in October 2016. *See* Exhibit 5 at 7.

    c.  He was on pre-trial release in Suffolk Superior Court (Dkt. # 1584-CR-11273) on charges of armed robbery, assault with a deadly weapon, assault and battery with a dangerous weapon, and witness intimidation. *See* Exhibit 5 at 7.

4.  In October 2019, Rodriguez violated the terms of his probation in Middlesex Superior Court (which sentenced him to 84 months of probation, through May 2022) when he was arrested by Massachusetts State Police and charged with possession with intent to distribute crack cocaine. *See* Exhibit 2 at 3.

5.  In October 2019, Rodriguez was also still on probation in the Middlesex Superior Court when he committed some of the conduct charged in the instant racketeering conspiracy—namely, packaging crack cocaine for distribution in the Latin Kings stash house in New Bedford. *See* Exhibit 1 ¶ 76.

Rodriguez's flagrant disregard for the law is also apparent in his evasion of arrest on the instant charges for nearly three months after his arrest warrant was issued. Rodriguez knew of the charges against him in this case, and that he was wanted by federal authorities: on December 30, 2019, he posted to his publicly-accessible Instagram account a picture of his mug shot as it appeared on a Latin Kings organizational chart—which was released publicly by the FBI on

December 5, 2019, and included in the detention affidavit, *see* Exhibit 1 at 190—with the message "free the crown."  *See* Exhibit 8.  Thus, far from turning himself in when he was aware of a warrant for his arrest, Rodriguez taunted federal agents by posting his mugshot on a public social media account and continued to evade arrest for two more months.

Rodriguez's extensive criminal history and inability to comply with court-ordered conditions of probation or pre-trial release demonstrate that he is a persistent danger to the community as well as a flight risk, and weighs strongly in favor of his detention.

### C.   The Nature and Seriousness of the Danger Posed by Rodriguez's Release Requires His Detention

The violent nature of Rodriguez's charged offense and his lengthy criminal history demonstrate that he is a danger to the community.  18 U.S.C. § 3142(g)(4).  The serious nature of his offenses—including convictions involving witness intimidation, assaults, and armed robbery; his leadership of efforts to identify and intimidate gang members suspected of being informants; and his involvement in the gang's distribution of crack cocaine—further justify his detention.

As discussed above, Rodriguez has a history of violent crimes that injured numerous people, and he committed many of these acts despite being on pretrial release or probation. Indeed, nearly every time he is released, he reoffends, and there is no indication that he would have any respect for this Court's conditions of release when he has refused to comply with conditions imposed by other courts.  *See* Exhibit 5, at 7 (Rodriguez "violated probation in nearly every case where he has been placed on probation (totaling eight separate violations)").  His violent history— considered along with his involvement in the Latin Kings and pattern of intimidating witnesses and violating the terms of release—show that no conditions can be devised to protect the community or mitigate the risks of flight or obstruction of justice.

## II.     The Circumstances Created by COVID-19 Are Not a Sufficient Basis For Rodriguez's Release

Nor does the COVID-19 pandemic, or Rodriguez's health conditions, alter the Section 3142(g) calculus that weighs so strongly in favor of detention.  The Government appreciates the gravity of the COVID-19 pandemic, and acknowledges that it presents a national and state public health emergency.  Though Rodriguez claims to have asthma and other conditions, he offers no objective evidence to support his claims or demonstrate the severity of these conditions.  Nor does he show that two of his claimed conditions—a collapsed lung and MRSA—affect his health now, or make him more prone to COVID-19.  Even if he has these conditions, they do not negate the considerations weighing heavily in favor of detention.  Additionally, his speculative concern about a potential COVID-19 outbreak at Plymouth falls far short of showing a risk warranting release, particularly because he cannot show that Plymouth's infection-control protocols are inadequate to address the risks.  He also fails to show that, if released under his proposed conditions, he would not pose a danger to the community, a flight risk, and an obstruction risk.

### A.  *Rodriguez Does Not Demonstrate A Particularized Vulnerability to COVID-19 Sufficient To Warrant His Release*

Rodriguez, age 28, claims his "medical history places his life in danger should he continue to be housed" at Plymouth because he suffers from chronic asthma and other medical conditions that make him more susceptible to complications from COVID-19.  [D. 715 at 6].[3]  Although the defendant's "physical and mental condition" is one of the Section 3142(g) factors, Rodriguez has

---

[3] To the extent Rodriguez says his conditions put him "at higher risk of contracting severe forms of Covid-19" [D. 715 at 2], this claim is unfounded, as he cites no evidence that any health conditions make a person more likely to ***contract*** COVID-19.  At most, health authorities like the Centers for Disease Control ("CDC") have recognized that certain conditions put people "at higher risk for severe illness from COVID-19" if they contract the virus.  *See* "Information for Healthcare Professionals:     COVID-19     and     Underlying     Conditions,"     *available     at* https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last accessed April 29, 2020).

not provided sufficient evidence that his claimed conditions place him at a higher risk of adverse impact or make him more vulnerable than other detainees.  Nor has he shown that his health outweighs the other Section 3142(g) factors that favor detention.

Although Rodriguez claims that he has had asthma since he was a child, he does not provide information—let alone objective medical documentation—to show that his current asthma condition is sufficiently severe to increase his susceptibility to COVID-19.  While he says his "difficulties with asthma were particularly acute," he refers only to limitations on athletic activities when he was a child, and not to his current condition.  [Id.].  And although he says he has an emergency albuterol inhaler at Plymouth—and that he used a "full-face nebulizer" at unspecified times in the past—this is also not indicative of the severity of his current condition.  [Id.].

Since Rodriguez fails to provide any credible documentation of the severity of his asthma, he does not show that this condition puts him at higher risk of COVID-19 illness.  The Government is aware that the CDC has identified those with "moderate to severe asthma" as individuals who "may be at higher risk of getting very sick from COVID-19."[4]  Other medical professionals have also recognized that, while severe asthma is a risk factor for COVID-19 complications, patients with mild or moderate asthma likely face similar risks of COVID-19 as patients without asthma.[5]  Consistent with this expert guidance, this Court has recognized that the severity of a detainee's asthma—and credible documentation of this condition—is material to the determination of

---

[4] *See* "People with Moderate to Severe Asthma," *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last accessed April 30, 2020).

[5] *See* "Asthma is Absent Among Top Covid-19 Risk Factors, Early Data Shows," *available at* https://www.nytimes.com/2020/04/16/health/coronavirus-asthma-risk.html (last accessed April 29, 2020) ("'If you have mild or moderate disease, you're probably not going to behave much differently than someone who doesn't have asthma, particularly if you're a younger person,' said Dr. David Hill, a board member of the American Lung Association.  But he added that those with more severe cases 'may get more severity of the disease.'").

whether COVID-19 presents a health risk warranting release.  *See United States v. Cornieles*, 19-MJ-02569-MBB (D. Mass. April 16, 2020) (denying release of defendant who claimed to have asthma but provided only a brief letter from his wife's employer, a physician, to support this claim, and offered no dates or details of asthma treatment, or details concerning the severity of a recent condition that would make him more vulnerable than other detainees).  Since Rodriguez offers no credible documentation of his asthma, the dates or details of treatment, or details concerning the current severity of his asthma, this condition does not justify his release.

Nor do Rodriguez's other claimed conditions show that he is susceptible to COVID-19. He says his breathing problems are aggravated by a collapsed lung that he suffered five years ago when a bullet punctured his rib cage near his lung; yet, he concedes that this bullet was removed two years ago, and does not explain how or why this old injury affects his breathing now.  [D. 715 at 3].  He also claims that he contracted MRSA staph infections and that his "autoimmune system is compromised heightening his susceptibility to all infectious diseases."  [D. 715 at 3-4].  Despite his general assertion that treatment for MRSA "is difficult and time consuming," he does not say when he got MRSA or even claim that he still has it now.  [D. 715 at 4].  Nor does he produce any evidence that having MRSA, either now or in the past, is immunocompromising.  He thus does not show that his claimed conditions make him sufficiently prone to COVID-19 to warrant release.[6]

Furthermore, it is notable that Rodriguez does not offer any medical records or other credible evidence of his conditions; instead, he offers only an affidavit from his mother claiming he has these conditions.  [D. 715-1 at 1].  Rodriguez blames this lack of documentation on an

---

[6] Rodriguez also claims that he "has been diagnosed as suffering from bi-polar disorder, and significantly, PTSD" and that his PTSD and manic moods "aggravate his breathing problems." [D. 715 at 4].  Rodriguez provides no documentation whatsoever (including in his mother's affidavit) for these claimed conditions or their effect on his breathing.

inability to timely execute HIPAA releases at Plymouth.  [D. 715 at 5].  Even if this is true, the

fact remains that his entire argument for release relies on medical conditions, yet he fails to adduce

any credible evidence of these conditions or how they make him more vulnerable to COVID-19.

Such a bare-bones argument cannot shift the detention calculus, particularly where the other

Section 3142(g) factors weigh so heavily in favor detention.

Even assuming Rodriguez has one or more of his claimed conditions, his general claims

that they affect his breathing and immunity do not show that they are sufficiently severe to warrant

release.  The courts have recognized that a defendant cannot demonstrate entitlement to release

based only on a moderate medical condition that does not significantly enhance his risk of COVID-

19 compared to other detainees.  *See United States v. Pridgen,* No. 19-Cr-10375-RGS, at 3-5 (D.

Mass. Apr. 29, 2020) (reversing order releasing defendant with obesity and hypertension, finding

there was "no medical evidence in the record" that he had a condition "of a magnitude appreciably

greater than the many persons in the general population who suffer from hypertension," and that

release was not warranted where he was a danger to the community and "his medical circumstances

are not so exceptional as to tilt the balance in favor of his temporary release.").  Since Rodriguez

has not shown that he has an acute condition that puts him at high risk of COVID-19, his physical

condition does not outweigh the other Section 3142(g) factors that favor detention.

### B. *Rodriguez Alleges Only A Speculative Risk of COVID-19 and Has Not Shown that Plymouth's Infection Control Protocols Are Inadequate*

Rodriguez's speculative concern about a potential COVID-19 outbreak at Plymouth falls

far short of demonstrating a risk to his health sufficient to justify release.  He does not claim that

there are any positive COVID-19 cases at Plymouth or suggest that he has come into contact with

any affected individuals.  Nor can he show that the speculative risk of COVID-19 warrants his

release when he is at a facility that has taken robust precautionary measures to mitigate that risk.

The DOC has established precautionary measures to prevent the spread of COVID-19 in its facilities.   On March 25, 2020, the Sheriff of Plymouth County described the efforts the Sheriff's Department has taken to ensure a safe environment and reduce the risk of the introduction or spread of COVID-19 at Plymouth.   *See* Exhibit 9.   These measures include:

1) Adopting enhanced inmate intake procedures, including scrutiny of travel and exposure to illness;
2) Adopting treatment and detection practices consistent with guidelines issued by the CDC and Department of Public Health ("DPH"), and frequent consultation by the Sheriff's Department administrator with the DPH;
3) Suspending family and friend visits;
4) Restricting attorney visits to non-contact;
5) Restricting non-essential staff from entering the Facility;
6) Ceasing inmate work assignments that require travel outside the Facility;
7) Eliminating unnecessary movement within the Facility;
8) Establishing a housing unit for newly-admitted inmates and inmates who leave and return to the Facility, to monitor them for signs and symptoms of COVID-19 until they clear the incubation period;
9) Arranging for court hearings to be conducted by videoconference and telephone to limit inmate travel outside of the Facility and resulting possible exposure;
10) Changing recreation and meal schedules to provide more space in dayrooms;
11) Maintaining an aggressive cleaning schedule for the housing units;
12) Educating staff and inmates on proper social distancing and sanitation practices.

*See id.*, at 1-2.  The Affidavit also notes that Plymouth is "well below maximum capacity," which has "afforded the Department flexibility in making housing assignments which provide more space for the inmates." *Id.* at 2.

Rodriguez does not address the risk-mitigation procedures implemented at Plymouth, and there is no indication that these measures are inadequate to control the transmission of COVID-19.  Indeed, while the number of COVID-19 cases in Massachusetts has surged in the past two months, Plymouth's protocols have successfully prevented the spread of the virus in the facility.

Plymouth has therefore pursued reasonable preventive measures that have been successful, and it is prepared to provide adequate medical care to Rodriguez in the unfortunate event that he contracts the virus.  Rodriguez has failed to show that in light of these robust precautionary and

preparatory efforts, his continued detention puts him at sufficient risk of contracting COVID-19 to warrant release.  In these circumstances, his release is unwarranted.  *See United States v. Lee*, 2020 WL 1541049, at *6 (D.D.C. March 30, 2020) (denying motion for release where the defendant was detained at a facility that had "moved intentionally and swiftly to take myriad precautions for the protection of detainees," and emphasizing that: "DOC's actions represent that it is keenly aware of the problem, and just like the many other institutions in our society that are currently operating under enormously challenging circumstances, DOC appears to be doing its best to implement the leading health authorities' recommendations.").

Finally, the Government notes that several judges to address motions similar to Rodriguez's, both in this district and elsewhere, have denied release, even when the defendant claimed individualized health risk factors like asthma.  *See United States v. Cornieles*, 19-MJ-02569-MBB (D. Mass. April 16, 2020) (denying release of defendant who claimed an asthma condition but produced only minimal documentation that lacked details of his treatment and failed to show that he currently suffered from acute asthma); *United States v. Baez*, 19-CR-40049-TSH, Docket No. 99 (D. Mass. April 15, 2020) (denying release of defendant who produced no medical evidence of his claimed asthma diagnosis); *United States v. Moore-Bush*, 18-CR-30001-WFY (D. Mass, March 25, 2020) (denying release of defendant with "barely controlled diabetes" where there were no COVID-19 cases at her detention facility); *see also United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. March 17, 2020) ("While the record confirms that Martin has disclosed that he suffers from asthma, high blood pressure, and diabetes, this alone is insufficient to rebut the proffer by the Government that the correctional and medical staff at CDC are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus."); *United States v. Hamilton*, No. 19-CR-54-01 (NGG), 2020

WL 1323036, at *2 (E.D.N.Y. March 20, 2020) (denying release despite defendant's advanced age and history of stroke and heart attack where there were no reported cases of COVID-19 at his detention facility and the BOP was "taking system-wide precautions to mitigate the possibility of an infection within its facilities"); *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *8 (D. Kan. March 25, 2020) (denying release of defendant whose diabetes put him at increased risk of COVID-19 where the risk of an outbreak at his facility was speculative and he did not show that his proposed release plan would reduce his overall risk).

In a case like this—where the defendant offers no evidence of an acute health condition, raises only speculative concerns about the risk of illness, and is at a facility that has successfully implemented measures to prevent the spread of the virus—there is not a sufficient medical reason to warrant release, especially where the other Section 3142(g) factors strongly favor detention.

### C. Rodriguez's Proposed Conditions Would Not Reasonably Assure the Safety of the Community or His Appearance

Rodriguez does not show that his proposed plan for release would reasonably ensure the safety of the community or his appearance. In fact, his proposed conditions of release are wholly inadequate to ensure either. Despite his voluminous criminal history, evasion of arrest on the instant charges, and record of failing to appear for court hearings, Rodriguez claims that a $50,000 appearance and/or performance bond would suffice to "ensur[e] that he will not be involved in any bad acts of any nature and will appear when required at any future Court appearances." [D. 715 at 5]. Against the context of his past behavior while on probation, there is no reason to believe the proposed bond would secure his appearance or the safety of the community.

Nor would his proposed conditions offer such security. He seeks release to the custody of his girlfriend, to live at her home with her and her three children, and proposes that he would be subject to a "24-hour-a-day lockdown" at her home. [D. 715 at 6]. But Rodriguez offers no

reasons why she is an appropriate custodian and, as discussed above, Rodriguez has a long record of serious domestic violence incidents with past girlfriends.  Those incidents raise serious concerns about the safety of her and her three children if Rodriguez were to be released to her home.

## CONCLUSION

The COVID-19 pandemic is an unprecedented public health emergency and every facet of our Government is taking precautionary steps to slow the spread and impact.  Plymouth is taking cautionary steps in that regard, and has thus far been successful in maintaining a safe environment for detainees.  Even in the midst of this pandemic, the factors set forth in 18 U.S.C. § 3142 must still guide the Court in determining, on a case-by-case basis, whether pretrial release is appropriate, namely: whether there are conditions that can reasonably assure the safety of the community and the defendant's appearance.  The Government submits that where, as here, it can carry its burdens of demonstrating that the defendant poses a danger to the community, a flight risk, and a serious risk of obstruction of justice, and the defendant has failed to show that he suffers from a health condition that would warrant his release to home confinement on appropriate conditions, the defendant should not be released.  For these reasons, this Court should deny Rodriguez's Motion.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Rachel Goldstein*
Rachel Goldstein
Mark Grady
Assistant U.S. Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210
617-748-3100

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 40%;">

*/s/ Rachel Goldstein*
Rachel Goldstein
Assistant U.S. Attorney

</div>

Date: April 30, 2020